# EXHIBIT 4

## Constitutional Violations for Inclusion in the Habeas Petition

### A. Hasan's Constitutional Right to Present a Defense During His Court-Martial Proceeding, as Well as His Rights to Due Process and Equal Protection, Pursuant to the Fifth and Sixth Amendments to the United States Constitution, Were Violated Due to the Trial Judge's Exclusion of Hasan's Affirmative Defense of "Defense of Others."[20]

1. In his capital trial, Hasan sought to present only one defense – the defense of others. Specifically, Hasan proffered that his actions were in defense of Taliban members who were being unlawfully targeted by the United States. The Taliban are those who are trying to establish God's law as the supreme law of the land.

2. The military judge denied the defense on two grounds. First, the military [judge] concluded that the victims did not pose an immediate *or imminent* threat to any Afghan. (JA 399).[21] Second, according to the military judge, the legal status of the Afghanistan War was a "non-justiciable political question."[22] (JA 399). The military judge informed Hasan that he was "not

[20] With the exception of changing "appellant" to "Hasan," minor formatting changes, and the footnoted addition of some citations, this section A. is an exact duplicate of the Appendix to Appellant's Brief filed before the United States Court of Appeals for the Armed Forces. *United States v. Hasan*, USCA Dkt. No. 21-0193/AR (May 4, 2022), available at https://www.armfor.uscourts.gov/newcaaf/briefs/2022Term/Hasan210193AppellantRedactedBrief.pdf, at 202-14. The Appendix was prepared by Hasan's prior detailed military counsel, Major Bryan A. Osterhage, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), which holds:

> Appellate defense counsel has the obligation to assign all arguable issues, but he is not required to raise issues that, in his professional opinion, are frivolous. But he is, after all, an advocate, and if he errs, it should be on the side of raising the issue.

*Id.* at 435. Detailed appellate defense counsel fulfill their *Grostefon* duties by footnoting or attaching as an Appendix either their client's or their summary of the issue or by attaching as an Appendix the client's *pro se* writings addressing the issue. *Id.* at 435-36.

[21] JA refers to the Joint Appendix filed in *United States v. Hasan*, USCA Dkt. No. 21-0193/AR.

[22] Mr. Hasan believes that if the court had acted, the illegal attack on Iran would not have happened because President Bush should have been held accountable.

permitted to present extrinsic evidence or argument for a defense of defense of others." (JA 399). This was error in this capital case.

Law and Argument

1. The victims did pose an imminent threat to Taliban members

3. Self-defense is available where an accused apprehended, on reasonable grounds, that death or grievous bodily harm was *about to be* inflicted wrongfully on the accused. [*Manual for Courts-Martial* (M.C.M.), Rule for Courts-Martial (R.C.M.)] 916(e)(1).[23] This defense applies to the defense of others, like the Taliban. R.C.M. 916(e)(5).

4. The term "about to" in the context of self-defense is not further defined. The Merriam-Webster Dictionary defines "about to" as "on the verge of." In normal parlance, the term is expansive, and "on the verge of" may mean days or weeks.

5. In the context of self-defense, military cases have used "imminent" to describe what is "about to" be. *See United States v. Bransford*, 44 M.J. 736, 738 (Army Ct. Crim. App. 1996). "Imminent" similarly allows for a span of time. *See State v. Hundley*, 236 Kan. 461, 466[, 693 P.2d 475, 478] (1985).

6. Here, there are two bases to conclude the threat was imminent. First, because the United States had already engaged – and continued to engage – in an illegal attack against the Taliban, *see infra*, military personnel already represented an imminent danger to members of the Taliban.

[23] Available at https://jsc.defense.gov/Portals/99/2024%20MCM%20files/MCM%20(2024%20ed)%20-%20TOC%20no%20index.pdf?ver=b7JVpxV5rbIHg0ENlCRVKQ%3D%3D.

7. Furthermore, those pending deployment to support the United States operations constituted an imminent threat to the Taliban. This view comports with international law. For just one example, the United States Government concluded that it could act in self-defense and target cleric Anwar Al-Aulaqi because he posed what it deemed to be a "continued and imminent threat" despite the fact the United States was unaware of when attacks would take place, or indeed even if they would. *See* Memorandum for the Attorney General, Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi (Jul. 16, 2010).[24] So too, here, was the threat imminent, though the time and date when that threat would actually manifest was otherwise unknown.

2. The threat was unlawful

a. The Afghanistan War [was] illegal

8. The United States must have permission from United Nations (UN) Security Council to attack a fellow UN Member. Further, Congress and the President have signed the requirement for prior approval from UN Security Council . . . into law. President Bush indeed acknowledged this in the lead up to both the Iraq War and the Afghanistan attack by asking for permission (twice for Iraq) from the UN Security Council to go to war. The UN never granted such permission.

9. The United States is bound by the UN Security Council decision because Article VI, para. 2 of the U.S Constitution make[s] treaties adopted by the U.S part of the "law of the land." "[A]ll Treaties . . . which shall be made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby." Art. VI,

---

[24] https://www.justice.gov/sites/default/files/olc/pages/attachments/2015/04/02/2010-07-16_-_olc_aaga_barron_-_al-aulaqi.pdf.

cl. 2. That means that the military judge was bound to regard "a treaty . . . as equivalent to the act of the legislature, whenever it operates of itself without the aid of any legislative provision." *Foster v. Nielson*, 27 U.S. 253 (1829); *see also Ware v. Hylton*, 3 U.S. 199, 220-21 (1796).

10. Furthermore, a treaty (one among many others) was already in existence, the Montreal Sabotage Convention[25] to which both the United States and the Islamic Emirate of Afghanistan were parties. They are both member states of the United Nations. The UN has an entire regime to deal with issues in dispute, including access to the International Court of Justice to resolve international disputes arising under the Treaty, such as the extradition of Bin Laden. Former President Bush did not take this more peaceful and lawful approach. The Nuremberg Principles[26] define a crime against peace [as] "planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements, or assurances, or participation in a common plan for conspiracy for accomplishment of any of the forgoing."

11. President Bush's justification for attacking the Islamic Emirate of Afghanistan after being denied permission from the UN Security Council and three weeks after 9/11 was that it was harboring Osama bin Laden and training terrorists. That impoverished third-world country, which had a small informal army and no standing navy or air force, stated it had nothing to do with 9/11. Both the Federal Bureau of Investigation Director Robert Mueller and the Deputy Director of the

[25] The Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation (1971) (commonly known as the Montreal Sabotage Convention) is available at https://treaties.un.org/doc/db/terrorism/conv3-english.pdf.

[26] Principles of International Law Recognized in the Charter of the Nuremberg Tribunal and in the Judgment of the Tribunal (1950) (commonly known as the Nuremburg Principles) are available at https://legal.un.org/ilc/texts/instruments/english/draft_articles/7_1_1950.pdf.

Central Intelligence Agency [publicly] admitted there was no evidence linking Afghanistan to the September 11 attacks.

12. Afghanistan even offered to hand over Osama bin Laden to a neutral country until evidence was presented that linked bin Laden to the attacks. President Bush refused this offer and insisted Osama Bin Laden be handed over to the United States. Approximately three weeks later, the U.S. military attacked Afghanistan and continued its illegal attack until only recently. Any Afghan soldier that fought back to repel the illegal attack against them was classified as an unlawful enemy combatant, thus denying Afghan soldiers protection under the Third Geneva Convention,[27] i.e., prisoner of war status.

13. It is clear that the Taliban, led by Mullah Umar, at that time the recognized leader of the Islamic Emirate of Afghanistan, and a member state of the United Nations, were the innocent victims of an unlawful attack. They had the right of self-defense under UN Charter 51[28] and had no duty to retreat. The fact that the attacks on Afghanistan were in response to attacks believed to have been committed by people believed to be hiding in Afghanistan does not provide any legal justification whatsoever. The U.S. attacks on Afghanistan constitute an act [of] war [and] aggression by the United States against Afghanistan. No international/national law or policy legalizes these attacks on Afghanistan. No resolution of the North Atlantic Treaty Organization (NATO) provides legal justification for these attacks.

---

[27] Geneva Convention Relative to the Treatment of Prisoners of War (12 Aug 1949) (commonly known as the Third Geneva Convention), available at https://ihl-databases.icrc.org/public/treaties/375-GC-III-EN.002.pdf.

[28] Available at https://www.un.org/en/about-us/un-charter/full-text.

14. The United States, under President Bush, did not get approval of the U.N. Security Council thus making the attack on Afghanistan illegal under Article VI, paragraph 2 of the Constitution and the War Crimes Act of 1996 (U.S. Federal Law 18 U.S.C. 2441) which makes committing a war crime, defined as: ". . . a grave breech in any of the international conventions signed at Geneva 12 August 1949, or any protocol of such convention to which the United States is a party . . . punishable by fine, imprisonment or death." In other words, the Afghanistan war violated the Constitution, stripping the Taliban of their rights under the Geneva Convention and violated the War Crimes Act of 1966. It cannot be ignored that the government of Afghanistan is again Taliban controlled, and President Biden called an end to the "forever war." Nor can it be ignored that once the United States forces abandoned the war in Afghanistan, the rightful rulers – the Taliban – assumed control again.

15. As far as the Soldiers under President's Bush command: one of the most important principles established at Nuremberg is that individuals are responsible for their own actions, even if they were obeying orders, and that those in a position to give orders are responsible for the actions of those under them.

16. "Complicity in the commission of a crime against peace, a war crime, or a crime against humanity" is "a crime under international law." See Paragraph 500 of the Department of the Army Field Manual 27-10, The Law of Land Warfare (1956),[29] that was valid and binding at the time and was drafted for the Pentagon by Professor Francis Boyle's teacher of The Laws of War and of International Law at Harvard Law School, Army Major Richard R. Baxter, who later became the sole Judge of American Nationality sitting on the International Court of Justice.

---

[29] Available at https://tile.loc.gov/storage-services/service/ll/llmlp/law_warfare-1956/law_warfare-1956.pdf.

b. The illegality of the war is not a political question

17. The political question doctrine, formulated in *Baker v. Carr*, 369 U.S. 186 (1962), places a jurisdictional limit on those issues that are justiciable, thus subject to trial, and those matters that are the province of the other two branches of government which cannot be disturbed by the judiciary. *Id.* But the political question doctrine does not apply in criminal cases. *In Re Winship,* 397 U.S. 358, 363-64 ((1970); s*ee also* Francis A. Boyle*, Protesting Power: War, Resistance, and Law* (2008) at 157. Even if it does, it only acts as a restraint on Article III courts as a limitation to the "case in controversy" requirement. And military courts, as Article I courts, are not bound by such limitations. *Zevalkink v. Brown*, 102 F.3d 1236, 1243 (Fed. Cir. 1996).

18. Assuming *arguendo* that the political question does apply here, it should be interpreted narrowly. *Zivotofsky v. Clinton*, 566 U.S. 189 (2012). The principles presented by Hasan present matters that require examination of the historical and structural evidence regarding the war-making and treaty powers, but these are questions courts are well-prepared to resolve. Because the questions are difficult does not make his defense theory invalid. *Id*. at 201.

19. Moreover, all three cases cited by the military judge – *Huet-Vaughn*, *New*, and *Rockwood* – are distinguishable to Hasan's.

20. In *Huet-Vaughan*, unlike here, the accused was able to introduce evidence of her motives in leaving her unit. *United States v. Huet-Vaughn*, 43 M.J. 105 (C.A.A.F. 1993). "Considerable evidence was admitted regarding CPT Huet-Vaughn's moral, ethical, philosophical, and legal objections to the Persian Gulf War. [The military judge] permitted CPT Huet-Vaughn to present evidence of her concerns about deploying 'weapons of mass destruction' and its possible 'catastrophic consequence,' and her belief that obeying the deployment orders 'would have been immoral.'" 43 M.J. at 113. She was also permitted to testify that her purpose was not to avoid

hazardous duty but instead to "'educate and expose the nature of what was happening.'" *Id.* She presented so much evidence that Judge Sullivan, who dissented from [the majority's] reasoning and believed all the evidence was relevant to establish a defense, nevertheless found the military judge's error harmless beyond a reasonable doubt. 43 M.J. at 116-17.

21. In contrast, MAJ Hasan was not allowed to present evidence of the reasons for his actions. Such a void, especially in a capital case, cannot be sanctioned.

22. Hasan's case is also distinguishable from *United States v. New*, 55 M.J. 95 (C.A.A.F. 2001). New was an enlisted Soldier that refused to comply with an order to wear his U.S. Army uniform modified with UN accoutrements. New did so because he questioned the lawfulness of the President's decision to deploy troops to the Former Yugoslavian Republic of Macedonia (FYROM). 55 M.J. at 107. According to [the] Court, this did not provide a valid defense to a failure to obey a lawful order charge because "[w]hile the military judge determined that the order to wear the U.N. insignia was lawful, he properly declined to rule on the constitutionality of the President's decision to deploy the Armed Forces in FYROM as a nonjusticiable political question." *Id.* at 109. *New* further held that a soldier is not allowed to disobey an order because he believes it to be palpably illegal. *Id.* 108.

23. Hasan's case is different from *New* because it is not merely that MAJ Hasan *believes* the war in Afghanistan and the killing of Taliban and other Muslims illegal, it is, as previously discussed, illegal. Hasan's case is further distinguished from *New* in that New was alleging that the military judge erred in removing an element from the panel's consideration, specifically the order to New to don United Nations garb. 55 M.J. at 104. Conversely, here, the military judge stripped Hasan from presenting an entire defense to his charges.

24. Lastly, the military judge's reliance on *United States v. Rockwood*, 52 M.J. 98 (C.A.A.F. 1998), is misplaced. The military judge cited *Rockwood* for the proposition that Hasan was "a uniformed U.S. Soldier who [did] not have a justification or legal duty to fight for the Taliban or against fellow U.S. Soldiers." (JA 1327). In *Rockwood*, the appellant was an Army captain deployed to Haiti that decided to inspect a local penitentiary without command authorization. 52 M.J. at 101. After being convicted for conduct unbecoming an officer in violation of Art. 133, U.C.M.J., Rockwood argued that he should have received a duress instruction that did not include the language "of normal strength and courage." *Id.* at 113. The military judge erroneously relied on *Rockwood* because Rockwood actually received "what was functionally a necessity instruction," whereas Hasan did not. *Id.* at 113-14. That is considerably different than the situation presented here, where Hasan was unable to present his defense *in toto.*

3. Assuming arguendo that the defense fails, Hasan still maintained a constitutional right to tell his version of events

25. The Constitution guarantees an accused "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citations omitted). This includes the right for an accused to present his version of events. In *Rock v. Arkansas*, 483 U.S. 44 (1987), the accused, Vickie Rock, sought to introduce evidence she remembered after undergoing hypnosis. 483 U.S. at 47. Lower courts [excluded] . . . the testimony, with the Arkansas Supreme Court holding hypnotically refreshed testimony was per se inadmissible. *Id.* at 49.

26. The Supreme Court reversed. *Id.* at 62. The Court found such a rule violated the Sixth Amendment, restricting the right of Rock to present her defense, indeed "[i]t virtually prevented her from describing any events that occurred on the day of the shooting. . . ." *Id.* at 57.

27. Similarly, in *United States v. Kohlbeck*, 78 M.J. 326 (C.A.A.F. 2019), [the] court found a military judge's prohibiting Kohlbeck from even mentioning that he had even taken a

polygraph was error. 78 M.J. at 329. Such an interpretation was arbitrary and disproportionate to the purposes of the rules and court precedent. *Id.* at 332.

28. The same is true here. [T]he military judge prohibited Hasan from providing this affirmative defense. This was error, regardless of whether the defense of others [was] permissible, because Hasan's motive and reasoning for the actions were certainly relevant to the case. This error is structural, stripping Hasan of the right to present a defense, and also stripping him of the ability to present his story to those who would sit in judgment of his legal guilt and ultimately of his life.

**B. Hasan's Constitutional Rights, Pursuant to the Fifth and Sixth Amendments to the United States Constitution, Were Violated Due to the Unlawful Command Influence of the President and the Secretary of Defense, who are Driven by Unlawful Racial and Religious Animus, and Failure to Follow the Applicable Statutes, as well as the Military's Own Rules and Regulations.**

29. After the direct appeal process set forth in U.C.M.J. arts. 66 & 67, 10 U.S.C. §§ 866-67, as well as 28 U.S.C. § 1259, the final stage of military proceedings in capital cases is Presidential review of the death sentence. U.C.M.J. art. 57(a)(3), 10 U.S.C. § 857(a)(3). Specifically, The Judge Advocate General of the Army (TJAG) puts together the case record, opinions and orders of the appellate courts, along with "any clemency petition by prisoner and/or counsel, and the recommendation of TJAG" and forwards that record "to the SECARMY for the decision of the President." AR 190-55, para. 2-1(a).

30. The President's authority is only to approve, commute, or remit the death sentence. U.C.M.J. art. 57(a)(3), 10 U.S.C. § 857(a)(3). Consistent with the U.C.M.J., the Army Regulation governing military execution procedures also designates the President as the only person that "can

approve and order the execution of a death sentence." AR 190-55, para. 1-4.[30] The authority to "[d]esignate the method of execution," as well as the date, place of execution, and time, however, are reserved to SECARMY. *Id.* at paras. 1-4(a)(2)-(4) and 1-4(d)(3).

31. The President approved Hasan's sentence of death on Friday, October 2, 2026. On Monday, October 5, 2026, before the Acting SECARMY issued his execution order, the President publicly announced his order that Hasan would be executed by firing squad.[31] *But see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954) (a federal agency is obliged to follow its own regulations, policies, and procedures). Like the Attorney General in *Accardi*, the President, as Commander in Chief was required to follow the Army regulations published under the President's authority. Nonetheless, the President usurped SECARMY's authority in violation of AR 190-55, which also constitutes unlawful command influence (UCI) – "the improper use, or perception of use, of superior authority to interfere with the court-martial process" or another aspect of military justice.[32] The President is prohibited from "direct[ing] a subordinate . . . officer

[30] Typically, the person convening the court-martial (the "convening authority") is the same person that must review and approve the sentence adjudged by the court-martial post-trial. *See* R.C.M. 1107. Under military caselaw, the "convening authority" must be "neutral and detached." *See, e.g., United States v. Connell*, 42 M.J. 462, 466 (1995). As only the President can approve a death sentence under U.C.M.J. art. 57(a)(3), 10 U.S.C. § 857(a)(3), and R.C.M. 1107, the President essentially fills the "convening authority" role post-trial in capital cases. As such, the President must also be "neutral" and "detached." As noted below, President Trump has been anything but neutral and detached in relation to this case.

[31] Jonathan J. Cooper, *Trump Approves Firing Squad Execution for Fort Hood Shooter Nidal Hasan*, AP News (Oct. 5, 2026), https://apnews.com/article/trump-nadal-hasan-fort-hood-execution-6ab1d9cfb936d00d17c02105ea0a0ead. Mr. Hasan asked for a firing squad and public execution in a letter to the media long ago.

[32] The Judge Advocate General's Legal Center & School, *Criminal Law Deskbook* (Aug. 2025), Ch. 2(I), https://tjaglcs.army.mil/Criminal-Law-Deskbook-Print (*citing* Gilligan and Lederer, *Court-Martial Procedure* § 18-28.00 (4th ed. 2015)).

to make a particular disposition in a specific case or otherwise substitute . . . [his] discretion . . . for that of the subordinate . . . officer" – in this instance, as to the manner of Hasan's execution. U.C.M.J. art. 37(a)(5)(B), 10 U.S.C. § 837(a)(5)(B). UCI is "the mortal enemy of military justice," *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986),[33] and is strictly prohibited by U.C.M.J. art. 37, 10 U.S.C. § 837. The President, Secretary of Defense (SECDEF), and SECARMY are all specifically contemplated in the statutes as ranking officers who can be guilty of UCI. *See* U.C.M.J. art. 22(a)(1)-(4), 10 U.S.C. § 822(a)(1)-(4); *see also United States v. Bergdahl*, 80 M.J. 230, 236, 238 (C.A.A.F. 2020) (a sitting President, as well as a Senator, who was not subject to the U.C.M.J. but served as the Chairman of the Senate Armed Services Committee and "could delay or block assignments or promotions of senior military personnel," could be guilty of UCI). Moreover, aside from actual improper influence, the appearance of impropriety is just as significant and devastating to the rule of law. *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991) ("There is no doubt that the appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given [court-martial proceeding].").

32. After the President's approval of Hasan's death sentence and order for firing squad, on Tuesday, October 6, 2026, the Acting SECARMY issued a detailed execution order that included the method of execution directed by the President. *See* Exhibit 3. Even setting aside the evident UCI, AR 190-55 reserves this authority to **<u>the</u>** SECARMY, a position that requires not only appointment by the President, but also "the advice and consent of the Senate." 10 U.S.C. § 7013(a)(1). The Acting SECARMY – who was appointed to his acting role by the President on

---

[33] The United States Court of Military Appeals (C.M.A.) was renamed to C.A.A.F. by the National Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, § 924(a)(1), 108 Stat. 2663, 2831 (1994), https://www.congress.gov/bill/103rd-congress/senate-bill/2182/text.

September 3, 2026, following the resignation of the SECARMY,[34] but who has not yet received the consent of the Senate – lacked authority to order Hasan's execution.

33. AR 190-55 also requires notice to Hasan and his detailed military counsel. While both Hasan and his counsel were supposed to be "expeditiously" notified of the President's approval order by the Commandant, United States Disciplinary Barracks (CMDT, USDB), AR 190-55, paras. 1-4(j)(2) and 2-1(f)-(g), neither was given notice of the October 2, 2026, order until October 5, 2026 – the same day as the President's announcement and public order to the acting SECARMY. Hasan's counsel, assigned to Fort Belvoir, Virginia, was given insufficient notice or opportunity to be present at the USDB. Hasan was given official notice of the order the same date, even though the regulation requires the presence of counsel when the inmate is notified.[35]

34. The regulations likewise require that Hasan and his counsel be "immediately" notified of the execution order. AR 190-55, para. 1-4(j)(3). The Acting SECARMY issued the

---

[34] Ashley Roque, *Trump Taps Adam Telle as Acting Army Secretary*, Breaking Def. (Sept. 3, 2026), https://breakingdefense.com/2026/09/trump-taps-adam-telle-as-acting-army-secretary/.

[35] AR 190-55 para. 2-1(f)-(g) requires the presence of "a Trial Defense Service (TDS) attorney or the prisoner's civilian counsel (if reasonably available)." TDS generally provides "defense counsel services for Army personnel" where required by law or regulation or The Judge Advocate General of the Army (TJAG) in trial level court-martial proceedings. AR 27-10, para. 6-2. On appeal, however, "appellate defense counsel" from the Defense Appellate Division (DAD) rather than a TDS attorney, is "detailed" to represent the accused. *Id.*, paras. 5-67(c) & 12-4(c). Here, Hasan was and is represented by direct appeal counsel at the Army Defense Appellate Division, Jonathan Potter, who was detailed to represent Hasan in "the Court of Criminal Appeals, the Court of Appeals for the Armed Forces, [and] the Supreme Court," U.C.M.J. art. 70(c), 10 U.S.C. 870(c), as well as the Article 57(a)(3) review process which is a required part of "the review of court martial [capital] cases," U.C.M.J. art. 70(d), 10 U.S.C. § 870(d). *See also* R.C.M. 1202(b)(2). Likewise, while AR 27-10 presupposes the appointment of civilian counsel in federal habeas corpus proceedings, it also allows for detailed appellate military counsel "to assist counsel appointed by the District Court or individually retained for representation in such proceedings and any appeals therefrom." *Id.*, para. 12-14. By prior agreement, general counsel at the USDB had agreed to notify Potter so that he could be present rather than just a general member of TDS, who would have no familiarity with Hasan or his case and no established attorney-client relationship.

execution order on October 6, 2026, and Hasan's counsel was notified later the same day, again, with insufficient notice to be present when Hasan was officially notified.

35. SECDEF heads the Department of Defense (DOD).[36] 10 U.S.C. § 113(a)(1). SECARMY is "[s]ubject to the authority, direction, and control" of SECDEF. 10 U.S.C. § 7013(b).

36. SECDEF has no role in a military capital case, however, unless – and until – the President approves a death sentence. AR 190-55, para. 2-1(b) ("Upon approval by the President, and returning the decision to the **DoD** and HQDA [Headquarters, Department of the Army] for action, TJAG will make the appropriate notifications.") (emphasis added). SECDEF, however, made public statements calling for Hasan's execution for more than a year before the approval and execution orders were issued. In newspaper articles dated September 24, 2025, one headlined "Hegseth seeks death penalty for Fort Hood shooter Nidal Hasan,"[37] SECDEF was quoted as follows:

> "I am 100% committed to ensuring the death penalty is carried out for Nidal Hasan."
>
> "This savage terrorist deserves the harshest lawful punishment for his 2009 mass shooting at Fort Hood. The victims and survivors deserve justice without delays."[38]

---

[36] The President ordered that DOD "be known as the Department of War and the Secretary should be known as the Secretary of War." *See* Executive Order 14347, Sec. 1 (Sep. 5, 2025). Nonetheless, "Statutory references to the Department of Defense, Secretary of Defense . . . shall remain controlling until subsequently changed by the law." *Id.* Sec. 2(e). *See also* Haley Fuller, *The Department of War? Not Legally - What Trump's Executive Order Really Does*, Military.com (Oct. 20, 2025) (explaining that "the name 'Department of War' is more stagecraft than statecraft – a symbolic revival of an older identity that carries no new authority."), https://www.military.com/feature/2025/10/17/department-of-war-not-legally-what-trumps-executive-order-really-does.html.

[37] Lauren Keenan, *Hegseth Seeks Death Penalty for Fort Hood Shooter Nidal Hasan*, Straight Arrow News (Sept. 24, 2025), https://san.com/cc/hegseth-seeks-death-penalty-for-fort-hood-shooter-nidal-hasan/.

[38] *Id.*; Emma Bussey & Jasmine Baehr, *Pentagon Seeks Trump Approval for First US Military Execution in 60 Years Following Fort Hood Mass Shooting*, Fox News (Sept. 24, 2025),

37. After the approval and execution orders issued, SECDEF publicly celebrated and announced to "far-right podcaster Jack Posobiec in an interview aboard the USS Abraham Lincoln"[39] that Hasan's execution would be public, a decision he declared to be a "no-brainer":[40]

> "We'll make sure that people are able to watch it, that it's public, because people need to understand that there's serious consequences for these types of things."
>
> "Of course we're going to do it at Fort Hood. We're going to do it on a Thursday, we're going to do it at 1 o'clock, which is when he did it, and it's going to be soldiers with rifles executing the firing squad."

*Id.* Later, SECDEF declared that Hasan's execution would not just be public but that it would be livestreamed. *Id.* ("A Pentagon official said Thursday that the execution – which Hegseth recommended and President Donald Trump approved – 'will be livestreamed' and Hegseth confirmed it in a post on X.").[41] This was hardly surprising given SECDEF's well-known desire

---

https://www.foxnews.com/politics/pentagon-seeks-trump-approval-first-us-military-execution-60-years-fort-hood-mass-shooting.

[39] Haley Britzky, *Pete Hegseth Vows to Make First Firing Squad Execution in Decades 'Public,'* CNN (Oct. 8, 2026), https://www.cnn.com/2026/10/08/politics/pete-hegseth-vows-to-make-first-firing-squad-execution-in-decades-public.

[40] The video of this interview can be viewed within an article trumpeting the headline, "Hegseth thinks a firing-squad execution is entertainment." Walter Einenkel, *Hegseth Thinks a Firing-Squad Execution Is Entertainment*, Daily Kos (Oct. 8, 2026), https://www.dailykos.com/stories/2026/10/8/800109534/videos/hegseth-thinks-a-firing-squad-execution-is-entertainment/ (embedding video of the interview).

[41] Ironically, SECDEF's pronouncement was even covered by TMZ which is listed on its website and Google as "Celebrity News" & "Entertainment News." TMZ Staff, *Fort Hood Shooter's Firing Squad Execution Will Stream Live for Public Viewing*, TMZ (Oct. 8, 2026), https://www.tmz.com/2026/10/08/pete-hegseth-public-execution-fort-hood-shooter-live-stream/.

for a new Christian crusade against Islam.[42] Indeed, he even bears tattoos on his body related to the Christian Crusades[43] and defeating Muslims.[44]

38. Likewise, "Trump was initially giddy at the idea of a public execution and told reporters at the White House . . . that he 'absolutely' approved of it."[45] This reaction was in keeping

---

[42] Pete Hegseth, *American Crusade: Our Fight to Stay Free* (Center Street 2020). As a number of media outlets observed, the book is replete with "anti-Muslim rhetoric" and "depicts Islam as [the] historic enemy of [the] west." *See, e.g.,* Jason Wilson, *Trump Pentagon Pick Pete Hegseth's Books Foreground Anti-Muslim Rhetoric*, Guardian (Nov. 28, 2024), https://www.theguardian.com/us-news/2024/nov/28/pete-hegseth-trump-anti-muslim-book. One journalist even noted SECDEF "writes and speaks of himself as an enemy of Islam." Sarah Jones, *Pete Hegseth Finally Got His Holy War*, N.Y. Mag.: Intelligencer (Apr. 1, 2026), https://nymag.com/intelligencer/article/iran-pete-hegseth-holy-war.html.

[43] The Christian Crusades were a series of religious and military campaigns backed by the Latin Catholic Church between 1095 and 1291 to reclaim and defend the Holy Land from Muslim rule. *Crusades*, Wikipedia, https://en.wikipedia.org/wiki/Crusades (last visited Oct. 19, 2026).

[44] Odette Yousef, *Peter Hegseth's Tattoos Are Raising Some Eyebrows*, NPR (Nov. 14, 2024), https://www.npr.org/2024/11/14/nx-s1-5191413/peter-hegseths-tattoos-are-raising-some-eyebrows.

> [One of SECDEF's tattoos is] an image of the Jerusalem cross. So this looks like one large cross with four smaller crosses in the corners. It is a symbol of Christianity, and its origins date back to the Crusades. Hegseth also has another tattoo relating to the Crusades, of the words, deus vult - Latin for God wills it. And that was sort of the battle cry to take back the Holy Land and to slaughter Muslims.

*Id.* Significantly, these tattoos are symbols used in the "Christian nationalism" and "white supremac[y]" movements. Wilson, *supra,* note 41. SECDEF also has a "kafir" tattoo prominently displayed. This is an Arabic term used within Islam to describe an "infidel" or "non-believer." Marina Dunbar, *Pete Hegseth's Arabic Tattoo Stirs Controversy: 'Clear Symbol of Islamophobia,'* Guardian (Mar. 27, 2025), https://www.theguardian.com/us-news/2025/mar/27/pete-hegseth-tattoo-arabic-language.

[45] Ewan Palmer, *Trump Signals Doubts About Livestreaming Hasan Execution*, Yahoo News (Oct. 12, 2026), https://www.yahoo.com/news/politics/articles/trump-signals-doubts-livestreaming-hasan-154112998.html. The truth, however, is that the President was caught off guard by SECDEF's announcement that the execution would be livestreamed. Dan LaMothe & Tara Copp, *Trump cancels Hegseth's plan to live-stream Fort Hood shooter's execution*, The Washington Post (Oct. 15, 2026), https://www.washingtonpost.com/national-security/2026/10/15/trump-cancels-hegseths-plan-live-stream-fort-hood-shooters-execution/ ("A Trump administration official said .

with his long-term enthusiasm for torturing Muslims that he views as terrorists with humiliating and degrading deaths. Specifically, when he was on the campaign trail in his first run for President, he explained his support for "waterboarding" and other "advanced interrogation tactics" discontinued by the Obama Administration as torture by saying simply that "torture works."[46] He also told a false story in which he praised United States General John J. Pershing[47] for his actions during the Moro rebellion in the Philippines from 1902-13. The rebellion was waged by indigenous Muslim Moros, who resisted American sovereignty over the Philippines following the Spanish-American War in 1898.[48] As Trump told the story, in a manner that one journalist described as "a rambling speech highlighted by a giddy, almost childlike, enthusiasm for torturing and summarily executing the suspected enemies of America in the name of safety,"[49] Pershing lined up 50 of the Muslim terrorists for execution and dipped 50 bullets in pig's blood, because pork is repugnant to Muslims. Forty-nine of the 50 were executed in this fashion, but the fiftieth man was allowed to

. . that they 'can say with absolute certainty the White House was caught off guard' by Hegseth's announcement last week. The official, who like others spoke on the condition of anonymity due to fears of reprisal, said that many people close to Hegseth also appeared to be surprised.").

[46] Jenna Johnson & Jose A. DelReal, *Trump tells story about killing terrorists with bullets dipped in pigs' blood, though there's no proof of it*, The Washington Post (Feb. 20, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/02/20/trumps-story-about-killing-terrorists-with-bullets-dipped-in-pigs-blood-is-likely-not-true/.

[47] *John J. Pershing*, Wikipedia (last visited Nov. 3, 2026), https://en.wikipedia.org/wiki/John_J._Pershing. General Pershing is best known for having led the American troops in World War I, but he also served in the Spanish-American War and, as a Major, oversaw occupation forces afterwards in territories gained in Cuba, Puerto Rico, the Philippines, and Guam.

[48] *Moro Rebellion*, Wikipedia (last visited Nov. 3, 2026).

[49] Benjy Sarlin, *Trump hails torture, mass killings with 'pigs blood' ammo in SC*, MS Now (Feb. 19, 2016), https://www.ms.now/msnbc/trump-hails-torture-mass-killings-pigs-blood-ammo-sc-msna799431.

live to tell the story of what happened. Trump declared that this action resulted in there being no more problem with Muslim terrorists for 25 years.[50] Trump referred again to this campaign trial tale after the deadly 2017 Barcelona attacks by a Muslim terrorist cell that killed 13 people and injured at least 130 others. Trump tweeted on X – "Study what General Pershing of the United States did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!"[51] Thus, he was apparently urging that this is an appropriate form of humiliation and degradation escalating the deserved punishment for Muslim terrorists, a call to action that at least one Muslim murder victim's sister took to be "anti-Muslim rhethoric" contributing to an "atmosphere of intolerance" in this country.[52] Her view is, of course, consistent with that of many others, who have pointed out the President's racist, anti-Muslim rhetoric that is often false but also designed to vilify Muslims "as subhuman, because of their faith."[53]

---

[50] Benjy Sarlin, *Donald Trump Tells 'Pig's Blood' Bullets Tale at S.C. Rally*, NBC News (Feb. 19, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tells-pigs-blood-bullets-tale-sc-rally-n522156. The video of this portion of the speech is embedded in this article.

[51] Alex Horton, *Trump said to study General Pershing. Here's what the president got wrong* The Washington Post (Aug. 18, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/08/18/after-barcelona-attack-trump-said-to-study-general-pershing-heres-what-the-president-got-wrong/. "It is unclear why Trump's original claim of '25 years' without 'a problem' increased to '35 years' in his tweet." Katherine Faulders, Alexander Mallin & Adam Kelsey, *Trump refers to inaccurate anecdote about Gen. Pershing*, ABC News (Aug. 17, 2017), https://abcnews.com/Politics/trump-tweets-reference-inaccurate-anecdote-gen-pershing/story?id=49280966. At a different time, Trump put the peaceful period after Pershing's alleged actions at 42 years. Tessa Berenson, *Trump Repeats False Pig's Blood Story at California Rally*, Time (Apr. 29, 2016), https://time.com/4312131/donald-trump-pigs-blood-muslim-story/.

[52] Liam Stack, *Trump's Remarks on Pigs' Blood Elicit Challenge From Sister of Chapel Hill Victim*, The New York Times (Feb. 22, 2016), https://www.nytimes.com/2016/02/23/us/politics/trump-pigs-blood-sister-chapel-hill-victim-barakat.html.

[53] *Id.*

39. Since that time, the President has continued to routinely and frequently engage in inflammatory rhetoric that flames racist, anti-immigration, anti-Arab, and anti-Muslim bigotry.[54] As noted recently:

> Throughout his rise in politics, Mr. Trump has vilified Muslims and people of Arab descent, stoking anger among his backers and building support for immigration restrictions, including banning Muslims from the United States. But in the past few months, anti-Muslim rhetoric has become increasingly normalized in the ranks of the G.O.P., particularly after the election victories of prominent Muslim politicians, including Zohran Mamdani in the New York City mayoral race and Dr. Abdul El-Sayed in the Michigan Senate primary.[55]

[54] *See, e.g.*, Odette Yousef, *Extremist rhetoric is often found in government messaging. Who's the target?*, NPR (Feb. 18, 2026), https://www.npr.org/2026/02/16/nx-s1-5704347/extremist-racist-messaging-trump.

[55] Zolan Kanno-Youngs, *Trump Stokes Islamophobia by Calling Democratic Candidates "Jihadists,"* N.Y. Times (Aug. 6, 2026), https://www.nytimes.com/2026/08/10/us/politics/trump-democrats-somalis-jihadists-muslim.html.

40. Following "widespread backlash,"[56] President Trump "called off livestreaming the execution," essentially "overrid[ing]" SECDEF's order.[57] The President said nothing, however, about reversing SECDEF's order to conduct the execution publicly. Meantime, at least one news report references SECDEF saying after the President's decision not to livestream the execution that it will still be public.[58] Thus, the precise circumstances of Hasan's execution remain unknown to him.

---

[56] Ellen Mitchell, *Hegseth Says Execution of Fort Hood Shooter Will Be Public: What to Know*, Hill (Oct. 8, 2026, updated Oct. 9, 2026), https://thehill.com/policy/defense/6137747-fort-hood-shooter-firing-squad-execution-livestreamed/. Objections to the livestream were voiced by the Vice President, members of Congress from both parties, former senior military officers, and counterterrorism experts. Kaanita Iyer, *Hegseth Gets Backlash over Livestreaming a Firing Squad Execution*, CNN (Oct. 9, 2026), https://www.cnn.com/2026/10/09/politics/fort-hood-execution-hegseth-livestream. Pope Leo, the U.S. Conference of Catholic Bishops, and other religious leaders also spoke out against livestreaming the execution. Chris Walker, *Report: Trump Is Having Second Thoughts About Livestreaming Military Execution*, Truthout (Oct. 13, 2026), https://truthout.org/articles/report-trump-is-having-second-thoughts-about-livestreaming-military-execution/; Isabella Volmert, *Robert Jeffress Supports Public Execution Announced by Pentagon*, Dall. Morning News (Oct. 9, 2026), https://www.dallasnews.com/news/faith/article/robert-jeffress-death-penalty-22470214.php. Indeed, a recent poll conducted by The Washington Post, ABC News, and Ipsos found that "8 in 10 Americans say the execution should not be live-streamed to the public." Amy B. Wang & Aluana Safarpour, *8 in 10 Americans Oppose Live-Streaming Execution of Fort Hood Shooter*, Wash. Post (Oct. 15, 2026), https://www.washingtonpost.com/national-security/2026/10/15/8-10-americans-oppose-live-streaming-execution-fort-hood-shooter-poll-shows/.

[57] Jack Detsch & Gregory Svirnovskiy, *Trump Calls Off Livestream of Fort Hood Shooter's Execution*, Politico (Oct. 15, 2026), https://www.politico.com/news/2026/10/15/trump-military-execution-livestream-canceled-01120035. As one "legal analyst" noted, livestreaming the execution of a man in a wheelchair "proved too compelling even for a president who wears his bloodlust openly." James D. Zirin, *The American Way of Execution*, Washington Monthly (Oct. 22, 2026), https://washingtonmonthly.com/2026/10/22/the-american-way-of-execution/.

[58] Anna Skinner, *Pete Hegseth Responds After Trump Rejects His Livestream Execution Plan*, Newsweek (Oct. 20, 2026), https://www.newsweek.com/pete-hegseth-responds-after-trump-rejects-his-livestream-execution-plan-12596536 (In his first comments "since Trump rejected his plans to livestream Hasan's public execution," SECDEF's comments were summarized as confirming "that Fort Hood shooter Nidal Hasan will get the death he 'deserves' at his public execution come December.").

41. There is also an obvious concern that approval of the execution itself by the President and SECDEF was driven by a bigoted animus of Constitutional dimension. Specifically, as noted previously, Hasan is an Arab[59] of Palestinian descent.[60] He is also a Muslim. *Id.* Each of these is "a recognizable, distinct class," easily and frequently "singled out for different treatment under the laws." *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

42. In light of these facts, as well as the President's and SECDEF's anti-Muslim enthusiasm for inflicting maximum disgrace and humiliation in order to "send a message" to Muslim terrorists, Hasan's constitutional rights have been so denigrated that his execution should be stayed.

---

[59] *See*, Institute for Middle East Understanding, *supra*, note 2.

[60] Gjelten, *supra*, note 1.